# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. 09-00143-04-CR-ODS** |
| | ) | |
| KRISTIN DOUGHERTY, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW the defendant, Kristin Dougherty, by and through counsel, and hereby submits this Sentencing Memorandum in the above-referenced case, pursuant to Rule 32 of the Federal Rules of Criminal Procedure. Sentencing is presently scheduled for April 27, 2011, at 9:30 a.m.

Mr. Dougherty and counsel have thoroughly reviewed the Presentence Investigation Report ("PSR") and have discussed all issues with respect to sentencing in this case. This memorandum is respectfully filed to assist this Court in determining an appropriate sentence in this cause.

## I.    PROCEDURAL BACKGROUND

The First Superseding Indictment alleged 143 counts against 11 separate defendants. The voluminous First Superseding Indictment named Mr. Dougherty in only four of the counts - Counts One, Two, Ninety-Eight, and One Hundred Twenty. Specifically, Mr.

1

Dougherty was charged in Count One with Racketeering in violation of 18 U.S.C. § 1962(c), Count Two with Racketeering Conspiracy in violation of 18 U.S.C. §1962(d), Count Ninety-Eight with Promotion Money Laundering in violation of 18 U.S.C. §1956(a)(1)(A)(I) and 2, and Count One Hundred Twenty with Wire Fraud in violation of 18 U.S.C. § 1343.

On June 30, 2010, Defendant Dougherty filed a motion to dismiss Count 98 for failure to state a claim. (Doc. 263) On September 8, 2010, this Honorable Court issued a Report and Recommendation granting the Defendant's motion and dismissing Count 98. (Doc. 314)

As a result, at the time of trial, Defendant Dougherty was charged with Counts One, Two, and One Hundred Twenty. With respect to the Racketeering and Conspiracy to Commit Racketeering counts, Mr. Dougherty was charged with the commission of only two predicate acts, Fourteen and Sixteen.

The defendant exercised his right to a jury trial which began on October 18, 2010. The trial began in the form of an evidentiary hearing for purposes of foundational evidence as a result of co-defendant Abrorkhodja Askarkhodjaev's unwillingness to enter into foundational stipulations as to the government's exhibits. Following two days of evidentiary hearing, voir dire and jury selection began on October 20, 2010. Within minutes of jury selection, co-defendant Abrorkhodja Askarkhodjaev informed the government that he was willing to enter a plea of guilty to avoid a lengthy, approximately 5 week long trial. The court accepted co-defendant Abrorkhodja Askarkhodjaev's plea. The court recessed the jury until Monday, October 25, 2010, for the jury trial of defendant Dougherty. The jury convicted defendant Dougherty of all counts on Thursday, October 28, 2010.

## II.    PSR OBJECTIONS

Mr. Dougherty objected to numerous statements and conclusions made in the draft PSR which have been included in the Addendum to the final PSR.  Some objections by Mr. Dougherty require a determination by this honorable court due to their effect on the Guideline range.  Some of Mr. Dougherty's objections are in the nature of factual points made by the PSR writer and do not affect the guidelines range.  Lastly, in response to Mr. Dougherty's objections to the draft PSR, the PSR writer made additional comments. Mr. Dougherty's objections to the PSR writer's additional comments in the PSR addendum are discussed in turn below.

### A.    Objections that Affect the Guideline Range

#### 1.    <u>Loss Amount</u>

For purposes of sentencing, Mr. Dougherty objects to the 16-level enhancement for a loss figure between $1,000,000 and $2,500,000  as set out in ¶ 148 of the PSR.  Mr. Dougherty contends that the amount of loss for guideline purposes should be no more than $30,000, and in any event, no more than $400,000 to $1,000,000 as set forth in the plea agreements of all of the co-defendants in this matter except for defendant Abrokhodja Askarkjhodjaev.[1] If adopted by this court, the resulting effect on the guideline calculation would be a 12-level decrease in the current PSR calculation for loss between $10,000 and

---

[1]It should be noted that this was the original calculation of the PSR writer prior to input by the government.  The PSR writer's initial calculation was based on the plea agreements of the other co-defendants in this case.

$30,000.

U.S.S.G. §2B1.1, Application Note 3(B) regarding estimation of loss states that "the sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference."

Upon objection to the loss amount in the draft PSR, counsel for the defendant and the PSR writer were provided with a spreadsheet prepared by the government setting out a loss amount of $2,432,771.91. The breakdown by the government includes five categories of loss as noted in the addendum to the PSR. Approximately $507,008.14 of the total loss amount alleged by the government represents payments from Anchor Building Services to KC Janitorial, MMC Professional Cleaning and Giant Labor Solutions. The bulk of the government's loss calculation, $1,902,912.02, is based on the argument that the monies received by GLS from the Westin Crown Center and properties in Branson, MO were obtained in part through the participation of Mr. Dougherty. This $1.9 million figure attributed to the Westin and Branson, MO contracts does not appear to have been used by the government in contemplating the agreed upon loss amount with any of the co-defendants in this case. In fact, the lower loss amount has already been deemed accurate by this court in sentencing those co-defendants.

Undersigned counsel is aware of case law interpreting the calculation of loss amounts and the broad interpretation of § 2B1.1 and § 1B1.3 when contemplating the reasonably foreseeable acts of a conspiracy. However, the government has taken a position against Mr.

4

Dougherty that is inconsistent with its position in nearly every other co-defendant's case. With respect, it seems the government is seeking to attribute a higher loss amount to Mr. Dougherty for exercising his right to trial. In support of a loss amount between $10,000 and $30,000, Mr. Dougherty reiterates that he was charged in only two of the RICO predicate acts, Acts Fourteen and Sixteen. Act Fourteen charges wire fraud associated with two emails dated July 2 and July 7, 2008. Act Sixteen charges the illegal inducement of Alp Aktog into the United States on or about July 11, 2008. Accordingly, in convicting Mr. Dougherty of the substantive RICO violation charged in Count 1, the jury necessarily found him guilty of only the underlying predicate acts noted above.

Furthermore, pursuant to the verdict form regarding Count Two, Conspiracy to Commit Racketeering, the jury was only required to find under element number Five, that "the defendant voluntarily and intentionally joined in the agreement or understanding, whether at the time it was first reached or at some later time while it was still in existence, and at the time the defendant joined in the agreement or understanding he specifically intended to otherwise participate in the affairs of the enterprise."

Based on the language of the conspiracy verdict director and the dates of the underlying predicate acts, it is certainly possible that the jury convicted Mr. Dougherty for conduct that occurred in only July 2008. Undersigned counsel understands that the standard of proof for finding the applicable guidelines is a preponderance of the evidence standard as opposed to the beyond a reasonable doubt standard required of a jury. However, given language of the instructions it is clearly possible that the jury only convicted Mr. Dougherty

5

of the conduct that occurred in July 2008. Accordingly, Mr. Dougherty respectfully suggests that the loss amount should be $17,353.18, which represents the payments from Anchor to GLS from August 2008 until January 2009. If the court were to adopt this application of the guidelines, Mr. Dougherty would receive an enhancement of 4 levels pursuant to §2B1.1(b)(1)(C), rather than the 16 point enhancement currently contemplated by the PSR.

If the court does not find that the scope of Mr. Dougherty's conduct was limited to 2008, Mr. Dougherty respectfully suggests that the loss amount should be $255,293.79, which would result in a 12 point enhancement pursuant to § 2B1.1(b)(1)(G). This amount represents the deposits from Anchor to KC Janitorial from August 2005 to June 2006 and the Anchor deposits to GLS from August 2008 to January 2009. In support of this rationale, Mr. Dougherty argues that at the very best, the government's evidence supports Mr. Dougherty's entry into the conspiracy in October 2004. This is the date of the meeting between Abrorkhoja Askarkhodjaev, Bahkrom Ikramov, Kris Dougherty and Ron York. Prior to that date, Anchor had used one of Askarkhodjaev's companies for contracts in St. Louis. Accordingly, Mr. Dougherty cannot be considered to have entered the conspiracy prior to October 2004.

Undersigned counsel does not recall any evidence at trial that Mr. Dougherty actually obtained the Westin and/or Branson, MO accounts. There was no evidence that he met with the Westin representatives, and no Westin employees testified that Mr. Dougherty was the reason the account was awarded to GLS. In fact, witness statements produced by the government from representatives of the Westin Crown Center (Mills TenEyck and Cara Lou

6

Schmollinger) indicate that the contract was originally obtained by Pro-Line[2] and then "at some point in time" GLS became a subcontractor. Importantly, both representatives identify Abrorkhodja Askarkjodjaev and "Bob" (believed to be Bahkrom Ikramov or Nodir Yunosov) as their contacts for GLS. Testimony at trial indicated that Mr. Dougherty was only involved for a short period of time in setting up accounts in Branson, Missouri. In either capacity, there was no evidence that Mr. Dougherty received commissions for the Westin or Branson, MO accounts. There are simply no facts to support that Mr. Dougherty should receive a higher loss amount calculation than that of the co-defendants who have already pled guilty in this case.

### 2. Adjustment for Minimal or Minor Role

U.S.S.G. §3B1.2 regarding a downward adjustment for Mitigating Role states that Based on the defendant's role in the offense, decrease the offense level as follows:
a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels. b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
In cases falling between (a) and (b), decrease by 3 levels."
Application notes 3(a), 3(c), 4, and 5 regarding the applicability of 3B1.2 are instructive.
Note 3(a) states:
Substantially Less Culpable than the Average Participant.–This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant.
Note 3(c) states:
Fact-Based Determination–The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, involves a determination that

---

[2]For a discussion regarding Mr. Dougherty's objection to his alleged involvement with Pro-Line Management see Section B, *infra*.

is heavily dependent upon the facts of the particular case. As with any factual issue, the court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted.

Note 4 states:

Minimal Participant.–Subsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others in indicative of a role as minimal participant. It is intended that the downward departure adjustment for a minimal participant will be used infrequently.

Note 5 states:

Minor Participant.–Subsection (b) applies to a defendant described in Application note 3(A) who is less culpable than most other participants, but whose role could not be described as minimal.

First, it should be noted that the mastermind of the offense conduct, Abror Askarkhodjaev, was prepared to go to trial with Mr. Dougherty. According to the government, the trial was expected to take at least five full weeks for the them to put on their case-in-chief. Shortly after voir dire, but just prior to the selection of the jury, Mr. Askarkhodjaev made a decision to enter a plea of guilty pursuant to a Plea Agreement. Accordingly, Mr. Dougherty proceeded to trial as the sole remaining defendant. The trial of Mr. Dougherty lasted approximately 3-½ days instead of five weeks. This fact alone is a significant indicator of Mr. Dougherty's role in the offense.

Furthermore, Mr. Dougherty was only named in four of the 143 counts in the indictment and was only convicted of three of the counts. Other participants, including, but not limited to, Nodir Yunosov (Ninety Counts), Viorel Simon (Eighty-Four Counts), Ilkham Fazilov (Forty-Six Counts), Rustumon Shukurov (Forty-Seven Counts), Sandjar Agzamov

8

(Eight Counts), Andrew Cole (Forty-Five Counts) and Jakhongir Kakhkharov (Four Counts) were charged with as many or more counts than Mr. Dougherty and were more actively involved in the conduct of the enterprise. While Nordibek Abdoollayev and Bahkrom Ikramov were not charged in as many counts, they were integrally involved in the majority of the conduct of the enterprise as noted in the PSR and as set out in the allegations in the Indictment.

Moreover, Mr. Dougherty is named in only five paragraphs of approximately 184 overt act paragraphs spanning 26 pages of the indictment in this case.

It is also notable that the government did not call several of the co-defendants (who did not abscond) at trial. Simon, Fazilov, Agzamov, Cole and Kakhkharov were not called to testify against Mr. Dougherty. A review of their statements produced as part of the discovery reveals that these individuals had very little knowledge of Mr. Dougherty. However, as is apparent in the PSR, these individuals were responsible for the day-to-day affairs of the Enterprise. They prepared fake identification cards, set up nominee entities, threatened alien workers, lied about taxes and unemployment, obtained rent over and above the accommodations provided, failed to pay overtime, falsified insurance documents, and set up fake companies. Moreover, Bahkrom Ikramov and Nordibek Abdoolayev, both of whom testified pursuant to cooperation agreements, were involved in the day-to-day operation of GLS, just as the individuals who did not testify. Lastly, several individuals who were more culpable than Mr. Dougherty fled the United States prior to being arrested, including Nodir Yunozov and Rustamon Shukarov.

9

Evidence at trial also indicated that Mr. Dougherty's companies did business beginning in 2004 and lasting for approximately one year. Evidence at trial also indicated that Mr. Dougherty only had involvement with approximately two or three alleged victims in July 2008. There was an approximate two-year gap of time that Mr. Dougherty was not involved with the primary leaders and organizers of the conspiracy. Testimony at trial supported this important point. Interestingly, the loss amount now proposed by the government supports this point. Notably, the government's loss spreadsheet indicates that Mr. Dougherty's companies, including ABS, People, and Hotel and Resort Services, did not receive payment from GLS from June 2006 to August 2008. As noted above, the government bolstered Mr. Dougherty's loss amount by including the Westin and Branson accounts though there is evidence the Westin account was obtained prior to Mr. Dougherty's involvement in the conspiracy. There is no evidence that any monies flowed to Mr. Dougherty during that time period.

Most importantly, there was significant evidence presented at trial, including live testimony and pay stubs, indicating that Mr. Dougherty treated his workers with respect, paid all of their wages, including full overtime wages, taxes, unemployment and insurance premiums. Moreover, numerous individuals testified that Mr. Dougherty was attentive to the needs of the workers and also made sure they were housed in appropriate housing. His conduct was the polar opposite of what was occurring in Kansas City under the supervision of the co-defendants.

10

While the evidence suggests that Mr. Dougherty's conduct may very well meet the criteria for a 4-point reduction to reflect his minimal participation, in any event, Mr. Dougherty should be entitled to at least a 2-point reduction for minor role in the offense.

3. <u>Adjustment for 50 or More Victims</u>

Pursuant to Application Note 1 to U.S.S.G. § 2B1.1, the term "Victim" means "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. As noted above, it is plausible that the jury found that Mr. Dougherty was only involved in the conspiracy from July 2008 and beyond.

Accordingly, the evidence supports a finding of less than ten victims of Mr. Dougherty's conduct - Alp Aktog, Cuneyt Kozan, and Cuneyt Kozan's wife.

Mr. Dougherty's understands that the court may find that his scope of conduct begins prior to 2008 and therefore he is potentially liable for more than the three victims noted above. However, given the testimony at trial that Mr. Dougherty paid the workers of his companies the wages they were due, including overtime, as well as their insurance, taxes, and other benefits. it is clear that Mr. Dougherty could not reasonably foresee that the other members of the conspiracy would not do the same. It was not reasonably foreseeable to Mr. Dougherty that GLS's workers would suffer "actual losses" because it was Mr. Dougherty's practice to pay workers everything they were due so that they did not incur "actual losses" as required by the guideline. Accordingly, Mr. Dougherty requests this court to find that

11

with respect to Mr Dougherty there were less than ten victims and the enhancement under § 2B1.2 should not apply.

### 4. Adjustment for Sophisticated Means

Mr. Dougherty withdraws his objection to the enhancement for sophisticated means.

### 5. Conclusion to Objections that Affect the Guideline Range

Therefore, for purposes of sentencing, Mr. Dougherty presents the court with the above-referenced arguments that support a guideline Total Offense Level of 9. This calculation includes a four point enhancement under § 2B1.1(b)(1)(C), no upward adjustment for number of victims pursuant to § 2B1.1(b)(2), a two point enhancement for sophisticated means pursuant to § 2B1.1(b)(9)(C), and a downward adjustment of four points for minimal role in the offense pursuant to § 3B1.2(a). A Total Offense Level of 9 with a Criminal History I, results in a guideline range of 4-10 months of imprisonment.

**B.     Objections That Do Not Affect the Guideline Range**

Mr. Dougherty objects to the representations in ¶¶ 17, 18, 20, 24, and 25 that he was affiliated with Pro-Line Management. Pro-Line Management was owned by Michael Nelson and George Bennett and possibly Andrew Cole. There is no dispute that Mr. Cole was an employee of Pro-Line Management. Though Mr. Cole did not testify at trial, he made several statements to the government in advance of trial. Undersigned counsel understands that the memorandum of Mr. Cole's interviews are generally regarded as hearsay by the courts, counsel would proffer to the court that all discovery to date indicates Mr. Cole worked at Pro-Line from 2000 until he, Michael Nelson, and George Bennett bought the

company from an individual named Gary Clifton in 2006. Cole met Mr. Dougherty for the first and only time in 2006. To the extent other witnesses may have stated in their grand jury testimony or other interviews that Mr. Dougherty owned or operated Pro-Line, those witnesses are patently incorrect. Mr. Cole is the individual in the best position to give the proper information regarding this point. Furthermore, undersigned counsel does not believe the government introduced any evidence at trial indicating Mr. Dougherty owned Pro-Line at any point. Mr. Dougherty respectfully requests the PSR be amended to reflect the true nature of Pro-Line.

Mr. Dougherty continues his objection to ¶ 35 as stated in the addendum.

Mr. Dougherty continues his objection to ¶ 67 in that a portion of the sum of money was in the form of repayments of a personal loan made to GLS and KC Janitorial in order to buy vans and other operating needs. This was supported by evidence at trial, specifically Government's Trial Exhibit 716.

Mr. Dougherty continues his objection to ¶¶ 98 and 99 with respect to the inclusion of dismissed counts.

Mr. Dougherty further objects to ¶ 17 and the Probation Officer's Response to his Minimal Role objection. Specifically, in each paragraph noted, the probation officer refers to Mr. Dougherty as an "original organizer" of the scheme.[3] The allegations in the

---

[3]Though Mr. Dougherty has with drawn his objection to the inclusion of the sophisticated means enhancement, the probation officers response to his objection also includes language describing him as an "original organizer" and therefore he would request its removal for the reasons set forth above.

Case 4:09-cr-00143-ODS   Document 503   Filed 04/22/11   Page 13 of 36

indictment date back to 2000, and the probation officer indicates in her response to the minimal role objection that Mr. Dougherty was involved as early as 2001. Undersigned counsel has conferred with the Assistant United States Attorney who agrees that Mr. Dougherty was not involved at any point prior to at least 2003. It is undersigned counsel and Mr. Dougherty's contention that for purposes of sentencing he was not involved any earlier than October 2004. However, to be clear, the parties agree that Mr. Dougherty was not involved "as early as 2001" as stated in the PSR and the Addendum.

Accordingly, Mr. Dougherty should not be considered an "original organizer" of the scheme. If facts supported such a designation one would assume that the probation officer would request an aggravating role enhancement under § 3B1.1. No such enhancement is sought, nor is it supported by the facts.

Mr. Dougherty respectfully request that this court order an amendment to the PSR deleting the terms "original organizer" with respect to Mr. Dougherty and eliminating the reference to his involvement in 2001.

## III.    SENTENCE TO BE IMPOSED

### ADVERSE EFFECT UPON DEFENDANT'S CURRENT EMPLOYEES

Mr. Dougherty respectfully suggests that an important factor to consider when analyzing whether a sentence of incarceration is appropriate is the effect a sentence of incarceration would have on the employees of Marble Floors and More. Mr. Dougherty founded this LLC in 2005. He is the founder and creative leader of Marble Floors and More. This company is also the parent of a dba, St. Louis Trauma. St. Louis Trauma provides

14

trauma cleanup services following unattended deaths and suicides, or in the case of the commission of a violent crime. Mr. Dougherty is the marketing representative. Mr. Dougherty has intricate and specialized knowledge of the processes and equipment of the business. Mr. Dougherty has made and sustained numerous business contacts throughout his years in the St. Louis area that contribute to the success of the company. Importantly, Mr. Dougherty is the only person with the knowledge, skill, experience and relationships to run the business and meet the exacting requirements of its customers. He also routinely meets with banks to discuss financial issues, loans, debts, and other creditors in these difficult financial times. Clearly, these areas are most important to the operation of Marble Floors and More and its ability to continue in its present form.

Marble Floors and More employs approximately 11 employees in addition to the defendant, as well as four subcontractors, many of whom have been employed by companies owned by Mr. Dougherty for over many years. A term of imprisonment would be highly detrimental to the business, and, most likely, would cause the business to fail, and the employees will lose their employment and benefits. For many of these employees, Marble Floors and More is their sole source of family income. In a case similar to the case at bar, the Second Circuit upheld a downward departure based on the adverse effect imprisonment would have on the defendant's employees. *See United States v. Milikowsky*, 65 F.3d 4 (2nd Cir. 1995). In *Milikowsky*, the defendant sought a modest downward departure on the basis of adverse effect upon the employees of his companies. The court held that because the defendant was the only individual with the knowledge, skill, experience and relationships to

15

run his business, a downward departure was sufficiently justified. *Milikowsky*, 65 F.3d at 8.

*See also United States v. Olbres*, 99 F.3d 28, 32-37 (1st Cir. 1996) (job loss to innocent employees resulting from incarceration of a defendant may not be categorically excluded from consideration.)

Many of the factors enumerated in the *Milikowsky* and *Olbres* opinions are present in this case. Mr. Dougherty has generated and maintained numerous business contacts which now benefit and sustain the company, as well as its employees. Mr. Dougherty's employees have remained dedicated to him and the company. Obviously, the criminal conviction and his potential incarceration is a cause of concern to his employees and has contributed to an uncertain future.

## APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

As the Supreme Court has long recognized, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). With the United States Sentencing Guidelines now rendered "advisory only," *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007), a district court has substantial discretion in fashioning a sentence appropriate to the individual circumstances of the defendant and the unique facts of the offense. While the Court must consider the guideline range in a case, "the Guidelines are not the only consideration." *Gall v. United States*, 128 S. Ct. 586, 597 (2007). See *Kimbrough*, 128 S. Ct. at 564 ("the Guidelines, formerly

16

mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court determined that district courts must consider all of the sentencing factors under 18 U.S.C. §3553(a)(1)-(7) without giving mandatory weight to the sentencing guidelines. The Sentencing Reform Act instructs a Court to impose a sentence "sufficient, but not greater than necessary," to comply with the stated purposes of punishment. 18 U.S.C. § 3553(a). A sentence of probation will address all goals of The Sentencing Reform Act. 18 U.S.C. § 3553(a) states, in pertinent part, as follows:

> (a) Factors to be considered in imposing a sentence.--The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider–
>> (1) the nature and circumstances of the offense
>>> and the history and characteristics of the defendant;
>> (2) the need for the sentence imposed–
>>> (A) to reflect the seriousness of the
>>> offense, to promote respect for the law, and to provide just punishment for the offense;
>>> (B) to afford adequate deterrence to criminal conduct;
>>> (C) to protect the public from further crimes of the defendant; and
>>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>> (3) the kinds of sentences available;
>> (4) the kinds of sentence and the sentencing range established for...
>> (5) any pertinent policy statement...
>> (6) the need to avoid unwarranted sentence disparities among defendants
>>> with similar records who have been found guilty of similar conduct; and
>> (7) the need to provide restitution to any victim of the offense.

A sentence of probation will address all goals of The Sentencing Reform Act. In view of the jury's verdict, the defendant recognizes that it has been determined that his own conduct is the cause of his shame and embarrassment. However, it is respectfully suggested that the consideration of general and specific deterrence, proper punishment and an opportunity for rehabilitation are satisfied with a sentence as set out herein.

In addition, a district court "may not presume that the Guidelines range is reasonable," and instead "must make an individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 597. Moreover, the Supreme Court has specifically ruled that, in balancing the §3553(a) factors, a judge may determine that, "in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 128 S. Ct. at 564. See *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) (a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect §3553(a) considerations, or [that] the case warrants a different sentence regardless"). A district court may now vary from the applicable guideline range "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 128 S. Ct. at 570.

Moreover, certain courts have recently held that, if a court ultimately concludes after considering the 3553(a) factors that a non-guidelines sentence is appropriate, the court's sentence is entitled to highly deferential review by the appellate court only for a clear abuse of discretion. See, *United States v. Hucksin*, 529 F.3d 1312 (10th Cir. 2008). See also, *United States v. Burns*, 577 F.3d 887, 894-95 (8th Cir. 2009).

18

Other statutory sections also give the district court discretion in sentencing. Under 18 U.S.C. §3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation. In sum, in every case, a sentencing court must now consider all of the §3553(a) factors, not just the guidelines, in determining a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing.

**A)      18 USC §3553(a)**

**1.      Nature and Circumstances of the Offense & History and Characteristics of the Defendant**

With regard to the history and characteristics of Mr. Dougherty, the PSR calculated a criminal history category of I, with zero criminal history points. While the PSR contains a summary of Mr. Dougherty's social history, the truest reflection of his character is found in the numerous letters of support written on his behalf. The letters are written by people who passionately support this defendant. Mr. Dougherty clearly has the love and support of his family, as well as the respect of both the business community, as well as the community-at-large in all areas of the country in which he has worked. The personal and professional history section of this memorandum and the letters presented to this Court document that Mr. Dougherty is capable of conforming to rules and regulations. His history and characteristics justify an other than guideline sentence.

Mr. Dougherty has a significant history of charitable works that mitigate in favor of a non-guideline sentence. His charitable acts do not simply date back to post-indictment efforts. Mr. Dougherty has a longstanding and verifiable history of giving to others.

While the character letters that have been provided to the Court in advance of sentencing speak for themselves, several examples of Mr. Dougherty's charity are worth including in this memorandum.

- He served as a volunteer for the American Red Cross from 1991-1995. Significantly, during the flood of 1993, Mr. Dougherty, as Chairman, Mass Care, set up various housing and feeding areas and coordinated warehouse activities with the national chapter. These efforts resulted in his receipt of the Clara Barton Award in 1993.
- He served as a key volunteer for the Children's Miracle Network from 1992-2007. These efforts, performed in conjunction with the St. Louis County Fair and Air Show, contributed to a new wing for both the St. Louis Children's Hospital and the Cardinal Glennon Children's Hospital.
- He was a long time volunteer for the Ellisville Swim Team from 1987-2003. He was a key volunteer, setting up and weekly swim meets and yearly swim conferences.
- He has served in security detail for high-profile visitors to St. Louis, including President George Bush in 1986, Pope John Paul II in 1999 and Billy Graham in 2000.
- He has volunteered for both St. Louis County and St. Louis County Parks for various events, including Haunted Forest and Tree of Lights
- He served the community as a member of the Ellisville Park Board from 1986-1989 and was the recipient of the City of Ellisville Award in 1991.
- He has received the Missouri Community Betterment Governor's Leadership Award, presented by then Governor John Ashcroft. This award was presented for Mr. Dougherty's actions in saving three lives and for extensive community service.

Furthermore, as the single father of three children, Mr. Dougherty served extensively in a parent volunteer capacity from 1989-2005 in the Rockwood School District, assisting at classroom events, field trips, fund raisers, teachers' appreciation events, often finding

himself as the only father to do so. These activities and awards further confirm favorable mitigators in aide of Mr. Dougherty's sentence as to his history and characteristics.

In *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009), the defendant faced a guideline sentencing range of 12-18 months' imprisonment. The district court sentenced the defendant to one year of home confinement. One of the principal factors cited in the court's § 3553(a) analysis was the defendant Tomko's "involvement in exceptional charitable work and community activity." In affirming the sentence, the Third Circuit held that the district court's reliance on the defendant's charitable works was both "logical and consistent with the factors set forth in § 3553(a)." Interestingly, Tomko's charitable acts were post-indictment, and noted by the appellate court to be "less than sincere," however, the *Gall*-mandated "abuse of discretion" standard of appellate review required the circuit court to defer to the sentencing judge - who was "on the ground and [could] better separate sincerity from self-seeking." Mr. Dougherty's charitable works are neither post-indictment nor "less than sincere" and can be the basis for a variance.

### 2. The Need for the Sentence Imposed to Promote Certain Statutory Objectives

A sentence of incarceration is not always necessary in order to satisfy this sentencing mandate. It is the goal of sentencing to prevent unnecessary incarceration and to limit prison sentences to those individuals who pose the greatest risk to society. As renowned criminologist Norval Morris has consistently argued, and reflective of the recent Supreme

Case 4:09-cr-00143-ODS   Document 503   Filed 04/22/11   Page 21 of 36

Court decisions, when determining punishment, "the least restrictive (punitive) sentence necessary to achieve defined social purposes should be imposed."

Mr. Dougherty must be punished for his actions. However, it is imperative that a punishment be given which is proportional to the social harm committed, as determined by the Court, to serve the goals of sentencing.

**(A)    To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

**(B)    To Afford Adequate Deterrence to Criminal Conduct**

A review of the criminological literature reveals that to the extent that criminal sanctions do have a general deterrent effect, the certainty (how certain an offender will be deterred) of punishment has a far greater deterrent effect than the severity of the sanction. *Any* sentence of incarceration, however short, has a significant deterrent effect upon a white collar offender. Title 18 USC §3553(a)(2)(B)'s directive that the sentence imposed afford adequate deterrence to criminal conduct does not require a lengthy term of imprisonment. The fact that Mr. Dougherty was investigated, prosecuted, and found guilty for his actions should be sufficient to deter potential similarly situated white collar offenders. In addition, for individuals such as Mr. Dougherty, the loss of their career and livelihood as a result of their actions has a significant deterrent effect, perhaps as strong as any formal punishment meted out by the criminal justice system.

Case 4:09-cr-00143-ODS   Document 503   Filed 04/22/11   Page 22 of 36

### (C)    To Protect the Public from Further Crimes of the Defendant

The behavior for which Mr. Dougherty was convicted is uncharacteristic of the way he had conducted himself personally and professionally throughout his entire life up to, and since, the instant offense. This fact is made clear in the letters written to the Court on his behalf. He has disgraced himself and others close to him as a result of his arrest and conviction.

Mr. Dougherty has no substantial prior criminal history. The defendant presents low risk of recidivism. Defendants "over the age of 40...exhibit markedly lower rates of recidivism in comparison to younger defendants. "Recidivism rates decline relatively consistently as age increases, from 35.5% under age 21 to 9.5% over 50." See *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, at 12, 28 (2004). Many courts have recognized this factor in sentencing. *United States v. Lucania*, 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005) ("Post-*Booker* courts have noted that recidivism is markedly lower for older defendants."). *United States v. Carmona-Rodriguez* 2005 WL 840464, *4 (S.D.N.Y. April 11, 2005) (unpub.) (Where 55 year old woman pled guilty to distribution of drugs sentence of 30 months (below guideline range) proper in part "in view of the low probability that Carmona-Rodriguez will recidivate."

### (D)    To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

23

While Mr. Dougherty only completed the 8th grade, he has been gainfully employed since he was quite young. Mr. Dougherty suffers from no mental health disorders does not require any treatment in this regard. In short, this sentencing factor simply does not apply to Mr. Dougherty. In fact, the information provided with regard to this factor can be considered a sentencing mitigator. He is a self-made businessman and can continue to be a productive member of society.

### 3. The Kinds of Sentences Available

18 U.S.C. §3553(a)(3) requires the Court to consider "the kinds of sentences available" in a given case. Here, the Court has available many forms of punishment other than imprisonment which will permit it to craft an appropriate sentence for Mr. Dougherty, probation, home detention, community confinement, fines, and community service. Indeed, employing some combination of these types of sentences will allow the Court to both punish Mr. Dougherty sufficiently, and allow him the opportunity to pay restitution and rebuild his life.

With the Guidelines now advisory and with the enhanced sentencing discretion mandated by *Gall*, the Court is now able to use the availability of such non-custodial sentences to further calibrate a sentence so that it is no "greater than necessary" to accomplish the statutory purposes. As a result, in Mr. Dougherty's case, where there are mitigating factors, the availability of these alternatives under the law weighs in favor of the Court's use of them and against the imposition of a prison sentence. Indeed, courts have used this power in recent years to employ home detention or community confinement to address

unique circumstances, even where the applicable guideline range would formerly have prohibited anything but imprisonment. See, e.g., *Coughlin*, 2008 U.S. Dist. Lexis 11263 at *14-36 (where applicable guideline range was 27 to 33 months, court imposed sentence of probation, 27 months home detention and community service based on finding that defendant's poor health would be worsened by imprisonment); *United States v. Woghin*, 04 CR 847 (ILG) (E.D.N.Y. Feb. 6, 2007) (unpublished memorandum and order)(court sentenced corporate executive convicted of a multi-million dollar corporate fraud to 24 months split sentence, with half to be served in home confinement).

### 4-5. The Sentencing Guidelines Provisions

While the Court must consider the applicable guideline range and Sentencing Commission policy statements pursuant to 18 U.S.C. §3553(a)(4) and (5), it is respectfully suggested that any sentence within this range would be "greater than necessary" to serve the purposes of sentencing in this case. There are mitigating factors regarding Mr. Dougherty's offense and his personal circumstances which are plainly not accounted for in the sterile arithmetic of the computation of the applicable guideline range.

In *Gall*, the Supreme Court ruled that, under the law, a district court "may not presume that the Guidelines range is reasonable." 128 S. Ct. at 597. Indeed, this is a case which warrants a non-guideline sentence.

Each of the relevant sentencing considerations can be satisfied without imposing an advisory guideline sentence. The felony convictions alone serve as a general and specific deterrent. There is no credible evidence that he is a candidate for recidivism. He has been

25

shamed by his conduct. In short, there are substantial reasons as to how a sentence substantially below the advisory guideline range satisfies the concerns of 18 U.S.C. § 3553 and the holding in *Booker*.

An excellent analysis of the impact of the federal guidelines appears in *The Champion* (Sept./Oct. 2006) in an article styled, "The Continuing Struggle for Just, Effective, and Constitutional Sentence after *United States v. Booker*: Why and How the Guidelines Do Not Comply with § 3553(a)," by Amy Baron-Evans.

As an initial observation, Ms. Baron-Evans opines that "the guidelines 'place[s] undue weight on the amount of loss involved in the fraud,' which in many cases 'is a kind of accident' and thus 'a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." She cites the following authorities in support: *United States v. Emmenegger*, 329 F.Supp. 2d 416, 427-28 (S.D.N.Y. 2004) and *United States v. Adelson,* WL 2008727 *3 (S.D.N.Y. July 20, 2006).

She also points out that the Sentencing Commission has increased the punishment for economic crimes nearly annually, especially from 1987 to 1995, resulting in an "unplanned upward drift." *Id*. at 36. As an example, it is further noted that, "In the Economic Crimes Package of 2001, it lowered sentences for some low-loss offenders but significantly raised sentences for most mid to high loss offenders." *Id.* at 36.

Of particular significance to the case at bar is the research showing that the deterrence prong of 18 U.S.C. § 3553 is not necessarily satisfied with a custody sentence particularly in a white-collar case. Ms. Baron-Evans further concludes:

26

> The initial Commission increased sentences for economic crimes above past practice to provide a 'short but definite period of confinement for a larger proportion of these 'white collar cases' in the belief that this would ensure proportionate punishment and achieve deterrence.' A deterrence researcher advised the Commission that certainty is more important to deterrence than severity. Other research has shown that lengthy terms of incarceration have little deterrent effect on white collar offenders, presumably the most rational group of offenders.

She cites The Fifteen Year Report at 56, Hofer & Allenbaugh, *supra* note 50, at 61 n. 192; Sally S. Simpson, Corporate Crime Law and Social Control, 6, 9, 35 (Cambridge University Press 2002); and David Weisburd, et al., *Specific Deterrence is a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology, 587 (1995) in support of this contention concerning deterrence.

By similarity, counsel asks this court to consider a variance from the guidelines for Mr. Dougherty. In an economic crime, the offender should be in a position to work towards restitution as soon as possible. *U.S. v. Menyweather*, 431 F.3d 692, 702 (C.A.9 2005) (in case of embezzlement of $500,000, after *Booker*, no abuse for court to depart downward by 8 levels to probation in part because "a sentence of probation may have made Defendant better able to provide restitution to the victims of her crime, *see* 18 U.S.C. § 3553(a)(7)"), *U.S. v. Bortnick*, 2006 WL 680544 (E.D.Pa., March 15, 2006) (unpub.) (in eight million dollar fraud case where guidelines 51-63 months, one million dollar fine and sentence of 7 days sufficient in part because "Defendant owes a substantial amount of restitution, which he will be able to pay more easily if he is not subjected to a lengthy incarceration period."), *U.S. v. Coleman*, 370 F.Supp 661 (S.D. Ohio 2005) (where defendant was convicted of conspiracy

27

to violate provisions of Food and Drug Act regarding misbranded drugs, and where guidelines were 6-12 months court sentence to probation and community treatment center and house arrest in part because the "Court concludes that five years of probation, as opposed to one year of imprisonment or imprisonment with supervised release, will afford Defendants more time to pay restitution. 18 U.S.C. § 3553(a)(7)"); *U.S. v. Peterson*, 363 F.Supp.2d 1060 (E.D. Wisc. 2005) (where a defendant pled guilty to defrauding bank of $80,000 because of gambling addiction for which he is in counseling, and where guidelines range 12 to 18 months, court sentences to only one day in prison and supervised release of five years so defendant would not lose job and can pay restitution in light of the § 3553(a)(7) admonition that judge consider the need to provide restitution to the victim of the offense, and the § 3553(a)(2)(D) directive that court provide defendant with needed treatment in the most effective manner, and the § 3553(a)(3) statement that the court consider the kinds of sentences available); *U.S. v. Blackburn*, 105 F.Supp.2d 1067 (D.S.D. 2000) (where a defendant pled guilty to failure to pay child support and was $15,000 in arrears, and where guidelines called for 12-18 months of imprisonment with one year of supervised release, imprisonment counter-productive towards payment of child support, and court grants downward departure on its own motion to probation to make sure the defendant would be subjected to a longer term of supervision, which would not have been possible if imprisonment imposed.)

The most recent analysis of sentencing data performed by the U.S. Sentencing Commission reflects that judges are imposing below-Guidelines sentences that are justified

28

under a § 3553(a) analysis. The percentage of below-Guidelines "non-government sponsored" sentences that relied entirely on consideration of § 3553(a) factors in imposing a variance in cases in which no downward departure was given have increased from 7.3 in 2006 to 8.1 in 2007 to 10.1% in 2008, to a high of 12.2% through June 2009. U.S. Sentencing Commission, Preliminary Quarterly Data Report, 2d Quarter Release 2009, at Table 1 and Figure A; U.S. Sentencing Commission, Quarterly Sentencing Updates, Final Reports Years FY06, FY07, FY08, at Table 1.

Mr. Dougherty is well aware that the conduct for which he has been convicted has placed emotional strain on his family, which he deeply regrets. His conduct has also affected numerous other individuals, which he also regrets. A sentence consistent with the suggestions herein would serve all of the goals of punishment established by the Sentencing Reform Act.

### 6. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct.

Numerous co-defendants pled guilty in this matter pursuant to plea agreements with the government. Obviously, Mr. Dougherty exercised his constitutional right to a trial in this matter. However, a review of the sentences imposed to this point is particularly relevant to §3553(a)(6).

Ilkham Fazilov was sentenced to a total term of 41 months of imprisonment. Viorel Simon was sentenced to 25 months of imprisonment. Nodirbek Abdoollayev was sentenced to time served, approximately 22 months of imprisonment. Jakhongir Kakhkharov was

sentenced to time served, approximately 11 months of imprisonment. Abdukakhar Azizhodjaev was allowed to plead guilty to misprison of a felony and was sentenced to time served, approximately 1 and ½ months of imprisonment. Alexandru Frumasche was sentenced to time served, approximately 18 months of imprisonment. And finally, Bakhrom Ikramov was sentenced to three years of probation.

Besides Mr. Dougherty, two individuals have not been sentenced as of the date of this memorandum. Abrorkhodja Askarkhodjaev is currently requesting new representation. However, his plea agreement contemplates a sentence pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure of between 10 to 12 years. Mr. Cole is currently set for sentencing on May 15, 2011. Pursuant to conversations with the Assistant United States Attorney, it is anticipated that the government will request a sentence for Mr. Cole below his guideline range and below the sentence imposed against Mr. Simon, that is, less than 25 months.

An important benefit to the above named individuals is also the fact that the United States government has advocated for the issuance of visas to many, if not all, of the alien defendants. Testimony at trial from Mr. Ikramov and Mr. Abdoollayev suggested that the granting of the visa was a significant benefit to them. In fact, it could be argued that the sentences the above named individuals received would be a small price to pay in return for the ability to remain indefinitely in the United States.

Undersigned counsel is aware that this Honorable Court is in the position to assess the relative conduct of the co-defendants and compare it to Mr. Dougherty's conduct. However,

because the co-defendants pled guilty, and in particular, because Mr. Askarkhodjaev pled guilty, this court did not have the benefit of hearing testimony as to the full scope of involvement of the co-defendants. As noted above, several of the co-defendants did not testify and did not have a significant amount of information about Mr. Dougherty.[4]

These co-defendants were in Kansas City with Mr. Askarkhodjaev and the other co-defendants. They were working on a day-to-day basis with the criminal mastermind of the RICO charges. The court can look to the PSR for guidance as to the involvement of other co-defendants with respect to Mr. Dougherty.

For instance, a review of the PSR notes that, "The companies established by Askarkhodjaev, Agzamov, Kakhkharov, Ilkham Fazilov and Rustamjon Shukurov served four crucial roles in the fraud scheme." PSR at ¶51. Paragraph 51 goes on to point out how these co-defendants personally profited from percentage splits of the income and how the companies were used to avoid paying taxes and social security.

Mr. Kakhkharov is an example of an individual who was more involved in the enterprise than Mr. Dougherty. In fact, paragraphs 55 through 58 of the PSR detail the level of involvement of Mr. Kakhkharov. He and Mr. Askarkhodjaev created Midwest Management as a shell company. Mr. Kakhkharov operated Midwest Management as a payroll company. Notably the time period was from July 2007 through January 2008, a time period in which no evidence was adduced at trial to show that Mr. Dougherty was working

---

The arguments set forth in section II(A)(2), *supra*, are relevant for purposes of §3553(a)(6) and are incorporated by reference herein.

with GLS. Midwest Management and Kakhkharov were complicit in failing to pay taxes and proper wages during this time period, while the evidence strongly suggested that Mr. Dougherty did not participate in such conduct. Mr. Kakhkharov was sentenced to only 11 months of custody and granted a visa to remain in the United States.

Furthermore, much like the indictment, the offense conduct outlined in the PSR makes little mention of Mr. Dougherty. Of the 103 paragraphs in the PSR relating to offense conduct, only sixteen paragraphs mention Mr. Dougherty. Of those sixteen paragraphs, 4 of them mention his name in conjunction with Pro-Line Management, which is inaccurate.

Mr. Dougherty respects the decision of the jury in this matter. He understands that there were significant risks of going to trial. However, simply because he exercised his right to a trial does not mean he is more culpable than others involved in the offense. Nor does it mean that he was involved in more of the criminal conduct than some of the other individuals who pled guilty. It is Mr. Dougherty's contention that his conduct, as compared to others, warrants significant consideration with respect to 18 U.S.C. §3553(a)(6).

Mr. Dougherty understands that given the guideline range his request for a sentence of probation is significant. He does not make such a request lightly. Nevertheless, it is Mr. Dougherty's respectful position that the felony conviction alone sends a stern message and that a custody sentence would be unwarranted on this additional § 3553(a) factor in combination with the other §3553(a) factors noted above. It is also Mr. Dougherty's position that even with the worst interpretation of the facts before the court he should not be held more accountable than Mr. Kakhkharov. Therefore, in the alternative, Mr. Dougherty

requests a sentence of no more than 10 months in accordance with his suggested guideline range.

## IV. REQUEST FOR APPEAL BOND

Pursuant to 18 U.S.C. §3143(b), Mr. Dougherty requests this Court to allow him to be released pending appeal in the event it imposes a sentence of incarceration. Under the terms of §3143(b), the court is permitted to grant release pending appeal if the court finds -

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in -

(I) reversal,
(ii) an order for a new trial,

There can be no question that Mr. Dougherty is not a flight risk or a danger to himself or the community. Since his arrest on this matter over two years ago, Mr. Dougherty has had no issues while on pre-trial release and has abided by all conditions. In fact, Mr. Dougherty has been allowed to travel outside the country to the Virgin Islands without incident. He has committed no new offenses, has abided by all terms and conditions of his pretrial release and does not present a risk of danger to the community.

As for the issue of a "substantial question," the defendant has identified in both pre- and post-trial motions several grounds that raise a substantial question likely to result in a reversal or order for a new trial. For example, and without limitation, the defendant contends the trial court erred in allowing evidence regarding Alp Aktog in violation of the Fifth and

33

Sixth Amendments to the United States Constitution. The defendant filed a Motion to Dismiss based upon this issue, preserved the objection at trial, and raised the issue in post-trial motions. None of the exceptions of Rule 404(b) apply. This is a substantial issue and is likely to result in a new trial after appeal.

In addition, the defendant may raise on appeal that the trial court erred by allowing Rule 404(b) evidence regarding Talent Solutions Services. Mr. Dougherty filed a motion *in limine* with regard to this issue, preserved it at trial and noted it in post-trial motions. None of the exceptions of Rule 404(b) apply. This is a substantial issue that is likely to result in a new trial after appeal.

Also, Mr. Dougherty raised a sufficiency of the evidence claim with regard to all of the counts in which he was charged. Importantly, the charges of Conspiracy to Commit RICO and the substantive RICO counts against Mr. Dougherty are unique in their use in prosecutions for violations of Human Trafficking. Stated simply, the RICO statutes have not been used on a prior occasion in the context in which this prosecution was brought. This fact, combined with the fact that Mr. Dougherty was only named in two of the underlying predicate acts for the RICO charge leaves a significant possibility that the Court of Appeals could find that the facts of this case do not fit the elements defined by the RICO statutes.

Without waiving any of his other appellate claims, Mr. Dougherty asserts that at a minimum, these claims of error constitute substantial issues on appeal likely to result in a new trial. As such, his respectful request for release pending appeal is warranted in this case.

## IV.   CONCLUSION

A sentence of probation for Mr. Dougherty is consistent with *Gall's* instruction that district courts should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S.Ct at 598.  With respect, Mr. Dougherty's history and characteristics provide substantial mitigation to the imposition of a guideline sentence.

For the reasons set forth above, the defendant seeks a sentence of probation with whatever reasonable requirements the court desires.  As set out in this memorandum, under the circumstances, such a sentence would satisfy 18 U.S.C. § 3553(a) and allow him to make restitution as soon as possible.

In the alternative, he respectfully asks that if a custody sentence is imposed that the Court allow for self-surrender to the BOP-designated facility and for a recommendation that he be designated to a Federal Prison Camp nearest his family.

Respectfully submitted,

WYRSCH HOBBS & MIRAKIAN, P.C.

By:        s/ NATHAN J. OWINGS
                NATHAN J. OWINGS              #56568
                1000 Walnut
                Suite 1600
                Kansas City, MO  64106
                Tel:  (816) 221-0080
                Fax:  (816) 221-3280
                ***Attorneys for Kristin Dougherty***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically by CM/ECF on this 22nd day of April, 2011, with notice of case activity generated and sent electronically to all counsel of record.

_____ s/ Nathan J. Owings _____
***Attorney for Defendant***

36